195 N.J. Super. 59 (1984)
477 A.2d 1278
RAYMOND ARTHUR ABBOTT, A MINOR, BY HIS GUARDIAN AD LITEM, FRANCES ABBOTT; ARLENE FIGUEROA, FRANCES FIGUEROA, HECTOR FIGUEROA, ORLANDO FIGUEROA, AND VIVIAN FIGUEROA, MINORS, BY THEIR GUARDIAN AD LITEM, BLANCA FIGUEROA; MICHAEL HADLEY, A MINOR, BY HIS GUARDIAN AD LITEM, LOLA MOORE; HENRY STEVENS, JR., A MINOR, BY HIS GUARDIAN AD LITEM, HENRY STEVENS, SR.; CAROLINE JAMES AND JERMAINE JAMES, MINORS, BY THEIR GUARDIAN AD LITEM, MATTIE JAMES; DORIAN WAITERS AND KHUDAYJA WAITERS, MINORS, BY THEIR GUARDIAN AD LITEM, LYNN WAITERS; CRISTINA KNOWLES, DANIEL KNOWLES AND GUY KNOWLES, JR., MINORS, BY THEIR GUARDIAN AD LITEM, GUY KNOWLES, SR.; LIANA DIAZ, A MINOR, BY HER GUARDIAN AD LITEM, KYCUKA DIAZ; AISHA HARGROVE AND ZAKIA HARGROVE, MINORS, BY THEIR GUARDIAN AD LITEM, PATRICIA WATSON; AND LAMAR STEPHENS AND LESLIE STEPHENS, MINORS, BY THEIR GUARDIAN AD LITEM, EDDIE STEPHENS, PLAINTIFFS-APPELLANTS,
v.
FRED G. BURKE, COMMISSIONER OF EDUCATION; EDWARD G. HOFGESANG, NEW JERSEY DIRECTOR OF BUDGET AND ACCOUNTING; CLIFFORD A. GOLDMAN, NEW JERSEY STATE TREASURER; AND NEW JERSEY STATE BOARD OF EDUCATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 3, 1984.
Decided May 11, 1984.
*61 Before Judges ANTELL, JOELSON and McELROY.
Marilyn J. Morheuser argued the cause for plaintiffs-appellants (Flora Kimmich, David C. Long and Joyce D. Miller of counsel and on the brief).
Betram P. Goltz, Jr., Deputy Attorney General, argued the cause for defendants-respondents (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, of counsel and Betram P. Goltz, Jr. on the brief).
The Opinion of the Court was delivered by, ANTELL, P.J.A.D.
The complaint filed herein February 5, 1981 seeks judgment declaring that the finance provisions of the New Jersey statutory system of elementary and secondary school public education violate the Education Clause of the New Jersey Constitution and the Equal Protection Clauses of the New Jersey and United States Constitutions.
Plaintiffs are a number of children who assert that because they reside and attend schools in the school districts of Camden, East Orange, Irvington and Jersey City they do not enjoy the same educational opportunity as students in districts with greater tax revenues. They bring this action on their own behalf and on behalf of a class of all other children similarly situated. Defendants are New Jersey state officials responsible for administering the finance provisions of the public education laws and assuring that a thorough and efficient education is provided in all public school districts.
*62 After extensive discovery a trial date was scheduled for December 12, 1983. Defendants moved for summary judgment September 30, 1983 and after argument on November 15, 1983 the complaint was dismissed by order dated November 28, 1983 for failure to exhaust administrative remedies. Plaintiffs appeal.
Although not recited in the order under review, the trial court noted that because the Supreme Court has determined the statute to be "in all respects constitutional on its face," Robinson v. Cahill, 69 N.J. 449, 467 (1976) ("Robinson V"), plaintiffs' challenge to the facial validity of the present school finance laws was barred. While plaintiffs may be correct in arguing that the determination by our highest court in Robinson V does not foreclose a litigant from raising the question of facial constitutionality anew, it is clear that neither the Chancery Division nor we, as an intermediate appellate court, can grant the requested relief.
In Robinson, et al. v. Cahill, et al., 62 N.J. 473, cert. den sub. nom Dickey v. Robinson, 414 U.S. 976, 945 S.Ct. 292, 38 L.Ed.2d 219 (1973) ("Robinson I"), it was held that the New Jersey statutes then governing the financing of public elementary and secondary schools failed to carry out the State's obligation to provide a thorough and efficient education, N.J.S.A. Const. 1947, Art. VIII, § 4, par. 1. This determination was grounded in the finding that the system's substantial reliance on local property tax revenues produced gross disparities in the financial resources available for education among the different school districts within the state. On September 29, 1975 the legislature responded by enacting the Public School Education Act of 1975, c. 212, L. 1975, N.J.S.A. 18A:7A-1 et seq. (hereinafter "the Act"). After oral argument on November 24, 1975 addressed to the facial validity of the law, Robinson V was decided, rejecting the facial constitutional challenges.
It is important to this controversy to note that Robinson V was decided without any prior lower court determination and without the benefit of an evidential record.
*63 In substance, Robinson V held that the new statute corrected the constitutional infirmities found in Robinson I, noting in particular that it provided state financial aid for categorical programs, transportation costs and equalization support for current expenses, and also vested in the Commissioner of Education administrative powers and the duty to monitor and correct deficiencies in education, including those resulting from inadequate funding. Observing that the new financial supports reflected legislative recognition that the educational needs of the school districts could not be met by exclusive reliance upon local taxation, the Court stated that "[w]e cannot say that under these circumstances the dollar input per pupil ... will not be sufficient to offer each pupil an equal educational opportunity as required by the Constitution." 69 N.J. at 464. It added the following:
We do foresee a pattern of perhaps quite considerable change coming about as the procedures of this new legislation are brought to bear upon the system as a whole. How much state aid will be needed in any particular district at any particular time to supplement the local levy is something we cannot forecast. We must assume, as we do, that the state aid provisions in the Act before us represent the Legislature's best effort to prophesy as to what this need will be. [Id. at 464-465].
We are satisfied that in deciding Robinson V the Supreme Court intended nothing beyond an adjudication that the legislation was facially valid. As it said, "[o]nly actual experience with the Act will demonstrate whether there is further need for adjustment or modification." Id. at 467.
By holding that the complaint herein was appropriate for administrative action the trial judge envisioned the following progression of issues:
... the first question would be whether there are in fact any deficiencies in the education provided in the four districts. If the answer to that question is in the affirmative, then the next question would be presented. What is the magnitude, what is the scope of these deficiencies? The third would be the genesis of the deficiencies. The fourth would be what are the available means for remedying these deficiencies, and in fact it seems to be that since educational adequacy depends on a multitude of factors and not just financial input, and I believe that is the position of the Attorney General in this case, that the existence of a constitutional question could even be obviated by an appropriate *64 or a proper answer to that question. But even if this were not true, and it turns out that fiscal issue is the ultimate issue in the case, a factual record as to financing could be made in the administrative agency, and the viability of the issue of the availability of the funding scheme would be narrowed and clarified.
We discern from the foregoing remarks a fundamental misconception of the plaintiffs' claim to relief. The trial court either mistakenly believed that the complaint was addressed to the correction of inadequacies in the programs, services and facilities for education in the four districts or mistakenly conceived that the inquiry must be limited to those grounds alone, considering financial constrictions only to the extent that they were correlated to specific educational inadequacies. On this basis it was concluded that plaintiffs would first have to seek the administrative remedy which the trial court deemed available under N.J.S.A. 18A:7A-14 and 15, vesting broad investigative and supervisory authority in the Commissioner of Education, and under N.J.S.A. 18A:6-9, through which the Commissioner exercises jurisdiction over all controversies and disputes under the school laws. This holding, as we say, rested on the court's faulty premise that deficiencies in services, facilities and programs of education were the subject of the complaint. The complaint does not address those deficiencies as a basis for relief; it focuses solely and relentlessly upon the state aid provisions of the Act, alleging that these have produced disparities in financial resources available to the various school districts and consequential inequalities of educational opportunity even greater than those found in Robinson I. Moreover, the remedy sought, under the same principles and methodology as those applied in Robinson I, is an adjudication that the provisions aforesaid are unconstitutional in operation.
Only the Superior Court, not the Commissioner, can consider plaintiffs' claim or grant their requested remedy. While many considerations other than financial are relevant to a thorough and efficient education,
... it is nonetheless clear that there is a significant connection between the sums expended and the quality of the educational opportunity. And of course, the Legislature has acted upon that premise in providing State aid on formulas *65 designed to ameliorate in part the dollar disparities generated by a system of local taxation. Hence we accept the proposition that the quality of educational opportunity does depend in substantial measure upon the number of dollars invested, notwithstanding that the impact upon students may be unequal because of other factors, natural or environmental. [Robinson, et al. v. Cahill, et al., 62 N.J. 473, 481 (1973)]. [Emphasis supplied].
Thus, although defendants are free to demonstrate that equality of opportunity for a thorough and efficient education is nevertheless afforded because "of such other factors," Robinson V, 69 N.J. at 462, N.J.S.A. 18A:7A-5, it is clear that gross disparity in financial resources alone of the kind delineated in Robinson I could render the Act constitutionally infirm.
The complaint is a lengthy, complex document which, although sometimes obscure, appears to present a factual basis for the conclusion urged that in application the Act has actually magnified the very evils it was enacted to correct. Its central theme is that gross disparities in education resources continue and, indeed, have broadened during the years between 1975-76 and 1980-81. The asserted reason for this is that the law still depends heavily upon local tax revenues for school financing. While the complaint incidentally cites consequential effects in poorer districts such as high pupil-teacher ratios, dilapidated physical plants, lower basic skills test scores, less experienced teachers, etc., these are not posited as the subject of relief. What plaintiffs ask is the opportunity to provide the factually operative foundation notably lacking in Robinson V for a constitutional analysis of the finance provisions of the statute.
The nature of the complaint and its inappropriateness for administrative attention is best understood in terms of its challenge to the state aid equalization formula, N.J.S.A. 18A:7A-18. It is here, plaintiffs say, that the mischief resides. To appreciate their contention it is first necessary to examine how the formula works.
In determining the amount of equalization aid to be received by school districts the district's equalized assessed property valuation as determined by the State Division of Taxation is *66 divided by the resident pupil population to establish the district per pupil valuation. This figure is then used to compare each district's affluence against the statutory "guaranteed valuation per pupil." To arrive at the guaranteed valuation per pupil the total equalized property valuations in the state divided by the total number of pupils in the state (the state average valuation per pupil) is multiplied by 1.344. Thus, the guaranteed valuation per pupil is slightly more than 1/3 greater than the state average valuation per pupil. The "State support ratio" is then calculated by determining the percent by which the district equalized valuation per pupil falls short of the guaranteed valuation per pupil.
Up to this point the formula seems designed to provide greater aid to those school districts whose per pupil valuations compare least favorably to the guaranteed valuation per pupil and less aid to districts with per pupil valuations closest to the guaranteed valuation. Plaintiffs' attack, however, closes in on the next step in the calculation. The State support ratio is now translated into dollar support by applying it to the district's net current expense budget for the previous year.[1] Thus, if the district's equalized valuation per pupil is 20% less than the guaranteed valuation per pupil, the state equalization support *67 would consist of 20% of the net current expense budget for the previous year. If we correctly understand the theory of the complaint, supported by its factual allegations, it is that the larger the net current expense budget the greater the state aid, and its underlying proposition is that a significant correlation exists between high net current expense budgets and high per pupil property values. Its necessary converse is that low net current expense budgets and low per pupil valuations also go hand in hand. Broadly stated, therefore, the net current expense budget is perceived as the link between taxable property values and financial resources for education with the result, plaintiffs contend, that the equalization formula favors the wealthier districts over the poorer.[2]
Two factors, plaintiffs maintain, operate to assure a steadily widening financial gulf between wealthy and poor districts. The first is that the State's support ratio is applied only to the net current expense budget of the previous, not the current, year. This, they claim, discourages poorer districts from increasing their budgets since they must first finance the increases for a full year out of local revenues before they become eligible for added equalization support. The other factor is that equalization support is included in the net current expense budget, thus providing a mechanism to enlarge the base for calculating equalization aid to wealthier districts more rapidly than for poorer districts. For example, wealthier districts receiving high equalization support in 1982 because of a high *68 net current expense budget in 1981 which was financed by local tax revenues are able to accelerate their budget growth for purposes of 1983 assistance faster than poor districts because of the greater equalization support received in 1982. With the budgets being increased at this greater rate due to larger equalization support payments the wealthier districts enjoy a built-in assurance of disproportionally greater increases in their support eligibility. The poorer districts, on the other hand, which receive less in the way of equalization support because of their already lower budget base, increase their support entitlements at a proportionally slower rate. Thus, plaintiffs would argue on the basis of facts which they propose to prove, under the equalization formula a continued and accelerated widening of the gap between wealthy and poor school districts is unavoidable.[3]
Plaintiffs include among their allegations claims that during the base period measured between 1975-76 and 1980-81 further disequalization of property valuation per pupil between the wealthier and poorer districts has taken place which they say is demonstrated by the following chart:

 Equalized Property Valuation per Pupil
 Districts 1975-76 1979-80 Percent Change
 Camden $ 20,401 $ 23,759 +16%
 Ocean City 287,260 522,928 +82
 East Orange 35,999 35,170 -2
 Livingston 88,073 154,681 +76
 Irvington 50,813 55,248 +9
 Millburn 144,851 252,444 +74
 Jersey City 33,661 39,514 +17
 Paramus Boro 129,889 233,279 +80

They claim that the following chart of average equalized property valuation per pupil demonstrates that during the base *69 period the wealthiest districts experienced more than 11 times the growth in property value than did the poorest districts:

 Average Equalized Property Valuation per Pupil
District
Wealth
Groups[*] 1975-76 1979 % Growth $ Growth
 1 $129,526 $220,541 70% $91,015
 2 83,382 136,650 64 53,268
 3 72,874 113,321 56 40,447
 4 67,802 95,594 41 27,792
 5 51,635 78,017 51 26,382
 6 38,506 55,420 44 16,914
 7 24,488 32,420 32 7,932
State Av. $ 67,021 $102,339 53% $35,318

The increase in disparity, according to plaintiffs, in the net current expense budgets per pupil is even more dramatic, as is shown, they claim, by the following figures:

 Net Current Expense Budget Per Pupil
 % Increase
 in Disparity
 1975-76 1979-80 1976-80 
Camden $1266 $1447
Ocean City 1483 2225
 _____ _____
 Difference 217 778 258.5%
East Orange $1420 $1696
Livingston 1550 2355
 _____ _____
 Difference 130 659 406.9%
Irvington $1245 $1592
Millburn 2113 2653
 _____ _____
 Difference 868 1091 25.7%
Jersey City $1396 $1735
Paramus Boro 1966 2899
 _____ _____
 Difference 570 1164 104.2%

Current expenditure per pupil disparities, plaintiffs allege, increased during the years in question at rates ranging from *70 28.9% to 2539.3%. They illustrate this claim in the following table:

 Current Expenditure Per Pupil
 % Increase
 in Disparity
 1975-76 1979-80 1976-80 
Camden $1535 $2009
Ocean City 1563 2748
 _____ _____
 Difference 28 739 2539.3%
East Orange $1546 $1996
Livingston 1593 2600
 _____ _____
 Difference 47 604 1185.1%
Irvington $1311 $1862
Millburn 2195 3001
 _____ _____
 Difference 884 1139 28.9%
Jersey City $1492 $2239
Paramus Boro 2050 3219
 _____ _____
 Difference 558 980 75.6%

In terms of averages the following figures are presented in support of the complaint:

 a. Average Net Current Expense
 Budget/Pupil 
District Wealth
 Groups 1975-76 1979-80
Group 1 (highest wealth) $1642 $2349
Group 2 1577 2250
Group 6 1294 1759
Group 7 (lowest wealth) 1272 1686
State Average 1427 1991
Range, Group 1 to Group 7 $ 370 $ 663

*71
 b. Average Current Expenditure/Pupil
District Wealth
 Groups 1975-76 1979-80
Group 1 $1752 $2671
Group 2 1689 2531
Group 6 1414 2083
Group 7 1504 2166
State Average 1550 2325
Range, Group 1 to Group 7 $ 248 $ 505
 c. Average Current Expenditure/Weighted
 Pupil 
District Wealth
 Groups 1975-76 1979-80
Group 1 $1681 $2529
Group 2 1628 2399
Group 6 1324 1920
Group 7 1372 1924
State Average 1472 2162
Range, Group 1 to Group 7 $ 309 $ 605

Numerous other assertions are contained within the complaint which, plaintiffs maintain, demonstrate the inequality of educational opportunity fostered by the Act. We will not attempt to deal with all of these since those already set forth adequately show the theory and factual basis of plaintiffs' claim for relief. The argument tendered by plaintiffs is that the inequalities in educational resources available to children in the State of New Jersey have steadily widened because of the unequal distribution of taxable property wealth among the school districts, the Act's continued reliance upon local tax revenues to finance the school system and the proclivity of the equalization formula provided in N.J.S.A. 18A:7A-18 to perpetuate inequalities. We are not called upon, nor do we offer, to *72 evaluate at this time the merits of plaintiffs' factual and constitutional claims. All we need determine is whether they are sufficiently appropriate for Robinson I analysis as to merit plenary judicial consideration.
Responding to plaintiffs' grievances, defendants note the power of the Commissioner of Education under N.J.S.A. 18A:7A-15 to order increases in school budgets and they contend that an administrative proceeding within the Department of Education may establish that the conditions complained of are remediable through the exercise of that power. One answer to this is that the record is silent as to whether the Commissioner has not already attempted to meet his ongoing obligations under that statute and, if so, the extent to which he has effectuated meaningful changes. Furthermore, ordering budgetary increases provides no solution unless the school districts have the fiscal ability to comply therewith. The tenor of the complaint suggests plaintiffs' willingness to join issue with defendants on the question of whether the poorer school districts are not already so overburdened with demands upon their meager fiscal resources as to be unable to afford any significant increases in their limited budgets.
In considering the facial validity of the Act, the Supreme Court in Robinson V acknowledged that the Commissioner's power over local budgets answered one of the constitutional deficiencies of the earlier statute ruled invalid in Robinson I. Robinson V, 69 N.J. at 458-463. But in so doing, it specifically noted the possible inefficacy of a Commissioner's order where a school district lacked the fiscal means for compliance. As to this it held that the mere chance of fiscal inability did not impair the facial constitutionality of the Act, but did so only on the assumption that per pupil tax resources would be more nearly equalized by the equalization formula and the guaranteed valuation per pupil upon which it is in part based. In the words of the Court, although the Act made no provision for the contingency of fiscal inability, this was "not fatal to the facial constitutionality of the Act since State school aid may obviate *73 that predicament." Id. at 466. But it intimated that this omission could assume constitutional dimensions if the statute's remedial provisions did not have their intended effect. Referring to what it had said in Robinson I to the effect "that `if the local government cannot carry the burden, the State must itself meet its continuing obligation,'" id. at 465, the Court went on to state the following: "Though such eventuality may never occur, the State must be prepared to meet this contingency if it does arise." Ibid. We are aware of no legislative measures thereafter enacted in response to this pointed admonition. Apart from the fact, therefore, that it is not within the Commissioner's competence to evaluate municipal tax bases and consider problems of "municipal overburden" which are necessarily involved in determining fiscal ability and resource disparity among districts, Robinson V at 465-66, no mechanisms have been enacted whereby deficiencies therein, should they exist, may be corrected.
Defendants' contention that plaintiffs may find their remedy in the Commissioner's power over local school budgets also misapprehends, as did the trial court's decision, the nature of the action which has been brought. It presupposes that the relief sought is the correction of deficiencies in the school districts' educational facilities, programs and services which may be repaired by increased funding. As we have explained, however, the attack is upon the entire state system of financing public education on the ground that it has produced gross disparities in the financial resources for education. Thus cast, the issue may only be addressed in constitutional terms on the basis of factual and economic issues which lie outside the expertise of the Commissioner. The rule requiring the prior exhaustion of administrative remedies rests on the premise that such remedies are "certainly available, clearly effective and completely adequate to right the wrong complained of." Baldwin Const. Co. v. Essex County Bd. of Taxation, 24 N.J. Super. 252, 274 (Law Div. 1952), aff'd 27 N.J. Super. 240 (App.Div. 1953), aff'd 16 N.J. 329 (1954). The issue to be decided is solely *74 one of law, involving a question of constitutionality which is beyond the power of the Commissioner to decide, and the doctrine of exhaustion of administrative remedies is inapplicable. Matawan Borough v. Monmouth Cty. Tax Bd., 51 N.J. 291, 296-97 (1968).
The order of dismissal is reversed and the matter is remanded to the Chancery Division for plenary hearing.
NOTES
[1] In other words, state aid is that percentage of the district net current expense budget by which the district's per pupil valuation falls short of the guaranteed per pupil valuation. However, state aid may not exceed the sum resulting from application of the support ratio to the product of the district resident enrollment and the state 65th percentile net current expense budget per pupil for the previous year when all school district figures are ranked from low to high. This is the "State support limit," N.J.S.A. 18A:7A-3. "Percentile" is sufficiently defined for our purposes as "the value of the statistical variable that marks the boundary between any two consecutive intervals in a distribution of 100 intervals each containing 1 percent of the total population." (Websters Third New International Dictionary 1969). Hence, the 65th percentile net current expense budget per pupil would rank higher than 65 percent of the net current expense budgets per pupil of all other school districts. The foregoing explanation of the State support limit is offered only in the interest of completeness and is not essential to an understanding of the equalization formula within the context of the complaint.
[2] We express no views as to the soundness of plaintiffs' rationale. Its merit would be clearer if the State support ratio were constant from one school district to another. As we have seen, however, it is formulated so as to rise or fall inversely to the district property valuation per pupil. Therefore, if plaintiffs' hypothesized correlation between property valuations and net current expense budgets is correct, it would seem that the effect of a high net current expense budget would at least to some extent be counteracted by the low support ratio which the accompanying high property valuation per pupil would require. This possible fallacy in plaintiffs' reasoning may be an open question to be resolved only after a careful consideration of all relevant factors which may be developed on a full record.
[3] Plaintiffs' contention clearly responds to the Supreme Court's observation in Robinson V at 69 N.J. 466 that "[o]nly actual experience with this formula will demonstrate whether it adequately serves the purpose intended."
[*] Each group has roughly equal numbers of pupils.