714 A.2d 299

ANTHONY JOHN CAMPIONE, PLAINTIFF–APPELLANT, AND NEW JERSEY CASINO CONTROL COMMISSION AND STATE OF NEW JERSEY, DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF GAMING ENFORCEMENT, INTERVENORS–APPELLANTS, v. ADAMAR OF NEW JERSEY, INC., T/A TROPWORLD CASINO AND ENTERTAINMENT RESORT, PAT SCULLY AND MICHAEL IMPERATRICE, DEFENDANTS–RESPONDENTS, AND WILLIAM PHIEL, ETHEL GUYS, AND JOHN DOES # 1–# 15, FICTITIOUS PERSONS WHOSE IDENTITIES ARE UNKNOWN AT THE PRESENT TIME, DEFENDANTS.

Argued March 16, 1998—Decided July 22, 1998.

*John R. Zimmerman,* General Counsel, argued the cause for intervenor-appellant New Jersey Casino Control Commission (*Mr. Zimmerman,* attorney; *Mary Wozniak,* Senior Counsel, of counsel and on the briefs).

*Charles F. Kimmel,* Deputy Attorney General, argued the cause for intervenor-appellant Division of Gaming Enforcement (*Peter Verniero,* Attorney General of New Jersey, attorney; *Mr. Kimmel, Frank Catania* and *Thomas N. Auriemma,* Assistant Attorneys General, of counsel).

*F. Michael Daily, Jr.,* argued the cause for appellant Anthony John Campione (*Quinlan, Dunne & Daily,* attorneys).

*John J. Barry* argued the cause for respondents (*Barry & McMoran* and *Hankin, Sandson & Sandman,* attorneys; *Mr. Barry, Adam N. Saravay* and *Tal S. Benschar,* on the briefs).

*Peter G. Sheridan* submitted a letter in lieu of brief on behalf of amicus curiae, Casino Association of New Jersey (*Graham, Curtin & Sheridan,* attorneys).

POLLOCK, J.

This appeal presents several issues. The first is whether the Casino Control Commission (CCC) has exclusive jurisdiction over claims by patrons against casinos for discrimination and breach of contract. A related issue is whether patrons may maintain such claims as common-law causes of action. The final issue questions the award of damages of $1,000,213.50 for malicious prosecution in favor of plaintiff Anthony Campione.

Campione was a blackjack player and professional card counter who frequented casinos in Atlantic City. The defendants are Adamar of New Jersey, which operates the TropWorld Casino; Michael Imperatrice, a floor supervisor and a member of TropWorld's card counting team; and Patrick Scully, TropWorld's Sergeant of Security.

On February 14, 1991, plaintiff sued defendants for discrimination, breach of contract, and malicious prosecution. He alleged that defendants selectively enforced gaming regulations against him because he was a card counter. The jury found that defendants were liable for discrimination and malicious prosecution and returned a verdict totaling $1,519,873.43.

The Appellate Division reversed and remanded the matter to the Law Division. 302 *N.J.Super.* 99, 694 *A.*2d 1045 (App.Div. 1997). It found that the CCC had exclusive jurisdiction over plaintiff's claims and that plaintiff could not maintain a private cause of action against defendants. The court also reversed the malicious prosecution award.

We granted plaintiff's petition for certification. 152 *N.J.* 9, 702 *A.*2d 348 (1997). We granted motions of the Casino Control Commission and the Division of Gaming Enforcement (DGE) to intervene and the CCC's petition for certification. 152 *N.J.* 9, 702 *A.*2d 348 (1997). The petition for certification of Doug Grant, Inc., which conducts a school to train card counters, was denied. 151 *N.J.* 472, 700 *A.*2d 883 (1997). We now modify the judgment of the Appellate Division and remand the matter to the Law Division.

## I.

The purpose of blackjack is to obtain cards having a higher count than those of the dealer without exceeding a total count of twenty-one. In blackjack, unlike in other games of chance, players' skill can increase the odds in their favor. Card counting is a method of playing blackjack that involves keeping track of the number of "high value" cards. This technique allows a blackjack player to identify a favorable count, which occurs when an unusually high percentage of the cards remaining in the "dealing shoe" are high value cards. At that time, the chances increase that the dealer will "bust," or deal cards that exceed 21 points, thereby permitting the card counter to win. A favorable count occurs infrequently, and almost exclusively after most of the cards have been dealt. Consequently, card counters must maximize their

play at such times. To do so, card counters may increase their bet, play two hands at once, or both.

Neither the Casino Control Act, *N.J.S.A.* 5:12–1 to –142(Act), nor the CCC prohibits card counting. The CCC, however, authorizes casinos to use various "countermeasures" to discourage card counting. For example, CCC regulations give casinos the discretion to shuffle the cards at will, *N.J.A.C.* 19:47–2.5a, or to lower the betting limit at any time, *N.J.A.C.* 19:47–8.3c. In addition to issuing its own regulations, the CCC allows, subject to its approval, casinos to adopt "Section 99 internal controls." *N.J.S.A.* 5:12–99.

To identify card counters, TropWorld employed a "Card Counting Team." After identifying plaintiff as a card counter, TropWorld's team applied countermeasures against him. Although TropWorld admitted to treating card counters differently from other patrons, it asserted that the treatment complied with CCC regulations and its Section 99 internal controls.

Because of the countermeasures applied by TropWorld and other Atlantic City casinos, plaintiff filed a number of "patron complaints" with the CCC. He particularly objected to the casinos' lowering his betting limit and limiting him to one hand, while simultaneously allowing other players to exceed the betting limit and play two hands. In response, the CCC informed plaintiff either that it needed to investigate the matter or that his complaint "does not indicate any violation of the Casino Control Act or pertinent regulations." Additionally, the CCC regularly informed plaintiff that the "Commission does not conduct hearings on individual patron complaints." For example, in an October 17, 1989, letter responding to plaintiff's complaint against Bally's Park Place Hotel Casino, the CCC stated:

> The [patron complaint] process is not designed to provide patrons with a forum for redress against casinos. The Commission is without authority to compel Casino Licensees to pay money damages to patrons, even in instances where a violation [of the Act and/or its regulations] has occurred. That authority rests with the Courts of the State of New Jersey.

With the exception of the present case, plaintiff never proceeded further with the CCC or sought to appeal the CCC's disposition of his complaints.

Plaintiff's action against TropWorld arises from two incidents. According to plaintiff, on April 27, 1989, TropWorld allowed other blackjack players, but not him, to play two hands during one deal. When plaintiff put his chips in the betting circle, the casino floor person instructed the dealer to deal past plaintiff. As a result, plaintiff filed a patron complaint with the CCC. By letter dated May 15, 1989, the CCC informed plaintiff that TropWorld's actions did not constitute a violation of the Act or the regulations. The CCC also explained:

> Be advised that the Commission does not conduct hearings on individual patron complaints. Rather, efforts are made to resolve such matters informally where possible. In addition, all patron complaints are reconsidered in connection with the annual renewal of each casino's license to determine whether it is providing the type of entertainment and services envisioned by the Legislature when it adopted the Casino Control Act.

The second incident took place on November 10, 1989, when plaintiff was playing blackjack at a TropWorld table with a minimum bet of $25 and a maximum bet of $1000. When the card count became favorable, plaintiff placed several unsuccessful bets of $300 and $350. The parties disagree over the ensuing facts.

According to plaintiff, after he placed a $350 bet, Imperatrice placed a sign on the table lowering the betting limit to $100. Imperatrice, however, maintained that plaintiff's initial bet was not in the betting circle before he lowered the limit. Otherwise, according to Imperatrice, he would have honored the bet.

Imperatrice informed plaintiff that he could not bet more than $100. According to plaintiff, Imperatrice then told the other player at the table that he could wager up to $1000. Without responding, that player left the table.

When Imperatrice pushed plaintiff's $350 bet out of the circle, plaintiff pushed it back. Plaintiff testified that Imperatrice then instructed the dealer to deal, but to pay plaintiff, if he won, based on a $100 bet. The dealer dealt a hand that qualified for a

"double down," which entitled plaintiff to double his bet. *N.J.A.C.* 19:47–2.10. Plaintiff then placed another $350 in the betting circle and won. Imperatrice instructed the dealer to pay plaintiff $200—for an initial $100 bet and a $100 "double down" bet. Plaintiff claimed that he was entitled to $700—for the initial $350 bet and the $350 "double down" bet.

Plaintiff stated that he then placed his hand on top of the cards, pulled the cards toward him, and advised the dealer that she had not paid him the proper amount of money. Although plaintiff knew he was not permitted to touch the cards, *N.J.A.C.* 19:47–2.6n, he wanted to preserve the cards as evidence. According to Imperatrice, however, plaintiff grabbed the cards. When Imperatrice informed plaintiff that he had been paid the proper amount, plaintiff asked to see a CCC representative. Imperatrice told plaintiff that to complain he must go to the CCC booth. He also informed plaintiff that if he did not relinquish his cards, Imperatrice would call security.

Shortly thereafter, Imperatrice called David Duffield, a lieutenant of security. Duffield called Scully, who told plaintiff to remove his hands from the cards. Plaintiff refused. Plaintiff's version is that he explained that he had been paid improperly and that he wanted to keep the cards as evidence. Scully, however, testified that he told plaintiff two or three times that if he did not take his hands off the cards and leave the game, Scully would arrest him. According to plaintiff, when he relinquished the cards, Duffield and Scully arrested him.

Scully and Duffield then escorted plaintiff to the CCC booth, where plaintiff sat down on the floor because, as he testified, he felt weak and lightheaded. Detective Ronald Hungridge of the DGE took plaintiff to the DGE office. After speaking with Scully, Hungridge informed plaintiff that he was under arrest. Although Hungridge described plaintiff as "very upset, very boisterous," plaintiff denied cursing or threatening any casino personnel.

Scully signed a complaint in the Atlantic City Municipal Court charging plaintiff with disorderly conduct, *N.J.S.A.* 2C:33–2(a),

"by causing an annoyance and disrupting the game of blackjack by retaining the playing cards and threatening TropWorld Employees." The complaint also charged plaintiff with defiant trespass, *N.J.S.A.* 2C:18–3, "by remaining in the casino complex after being formally ejected from same." The entire incident took place in less than an hour. Although plaintiff was never handcuffed or physically restrained, he said that he felt "humiliated" by the incident.

In the municipal court plaintiff was acquitted of the criminal charges. The court dismissed the disorderly conduct count on the ground that plaintiff had not caused a public annoyance. It also found plaintiff not guilty of the trespass charge because plaintiff was "legitimately trying to protect his bet." After the November 10, 1989, incident, plaintiff filed an affidavit with the DGE, but he did not file a complaint with the CCC.

On February 4, 1991, plaintiff filed this action in the Law Division against TropWorld, Imperatrice, and Scully. Initially, plaintiff sued several other TropWorld employees, who obtained a dismissal of the action. Seeking both compensatory and punitive damages, plaintiff alleged malicious prosecution, denial of equal access, discrimination, and breach of implied contract.

In April 1993, TropWorld moved for partial summary judgment. TropWorld claimed that CCC regulations authorized it to treat card counters differently; that plaintiff had failed to exhaust his administrative remedies; that the CCC had exclusive jurisdiction over the claims regarding application of CCC regulations; and that no cause of action existed for damages for a violation of or improper application of CCC regulations.

The Law Division rejected the argument that plaintiff had failed to exhaust his administrative remedies. 274 *N.J.Super.* 63, 643 *A.*2d 42 (Law Div.1993). It found that, in response to plaintiff's earlier complaints, the CCC had informed plaintiff that an individual patron does not have a right to request a formal CCC hearing and that the CCC's review process does not provide any remedy for private patron complaints. *Id.* at 72–73, 643 *A.*2d 42. In

addition, because the CCC had not finally determined the merits of plaintiff's complaint, his complaint was not subject to review by the Appellate Division. *Id.* at 74, 643 *A.*2d 42. Noting that it already had jurisdiction over plaintiff's breach of contract and malicious prosecution claims, the Law Division ruled that it could also hear his claim for discrimination. *Ibid.*

Concerning plaintiff's allegations of discrimination, the Law Division recognized that casinos must treat patrons fairly. *Id.* at 75, 643 *A.*2d 42. The court reasoned that the selective enforcement of card counting countermeasures against patrons at the same table constituted discrimination. *Id.* at 76, 643 *A.*2d 42. Hence, "it is discriminatory to allow others at the same table to play two hands, while limiting [plaintiff] to one." *Ibid.* The court, however, rejected plaintiff's complaints about TropWorld's right to "shuffle-at-will." *Id.* at 79, 643 *A.*2d 42. Because shuffling the cards affects all players at the table evenly, "it is not discrimination." *Ibid.*

The jury returned a $1,519,873.43 verdict in plaintiff's favor: $300,625.87 against TropWorld and Imperatrice on the discrimination claim; $219,034.06 in compensatory damages against Trop-World and Scully for malicious prosecution; and $1,000,213.50 in punitive damages against TropWorld for malicious prosecution.

All parties appealed. The Appellate Division reversed the judgment and remanded the matter to the Law Division. Initially, the Appellate Division stated that it had "grave reservations" about the Law Division's ruling that a casino must apply countermeasures uniformly to all players, including non-card counters. 302 *N.J.Super.* at 110, 694 *A.*2d 1045. According to the court, the CCC adopted countermeasures precisely to authorize the disparate treatment of card counters. *Ibid.*

The court held that the Law Division should not have entertained plaintiff's complaint. *Ibid.* The Appellate Division concluded that "the Act compels the *concentration* in the Commission of the power to define and regulate the manner in which games are played, and that this power extends to resolution of controver-

sies regarding application and interpretation of the Commission's rules of play." *Id.* at 114, 694 *A.*2d 1045 (emphasis in original). Therefore, the Appellate Division found no private cause of action against a casino for the alleged violation of CCC regulations governing the manner in which games are played. Instead, the CCC has exclusive jurisdiction over such claims. *Id.* at 118, 694 *A.*2d 1045. Rejecting the Law Division's conclusion that plaintiff lacked an adequate administrative remedy, the Appellate Division found that the CCC had responded to each of plaintiff's complaints. In addition, the court noted that the CCC has the power to make a patron whole by ordering a casino to make restitution of unlawfully retained money. *Id.* at 117, 694 *A.*2d 1045. Consequently, the court reversed the judgment awarding plaintiff damages for the casino's discriminatory treatment, but allowed plaintiff to submit his complaints to the CCC within sixty days. *Id.* at 118, 694 *A.*2d 1045. Because of defects in the jury charge, the Appellate Division reversed and remanded plaintiff's malicious prosecution award. *Id.* at 119–20, 694 *A.*2d 1045.

## II.

### A.

In 1976, Art. IV, § 7, ¶ 2 of the New Jersey Constitution was amended to enable the Legislature to authorize the operation of casinos in Atlantic City. *Bally Mfg. Corp. v. N.J. Casino Comm'n,* 85 *N.J.* 325, 328, 426 *A.*2d 1000, *appeal dismissed,* 454 *U.S.* 804, 102 *S.Ct.* 77, 70 *L. Ed.*2d 74 (1981). One year later, the Legislature enacted the Casino Control Act. *N.J.S.A.* 5:12–1 to 152. The Act legalizes casino gambling and establishes an elaborate framework for regulating the casino industry. *Knight v. City of Margate,* 86 *N.J.* 374, 380, 431 *A.*2d 833 (1981).

Crucial to this regulatory scheme is "the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations." *N.J.S.A.* 5:12–1b(6). To this end, the Legislature explained that "the regulatory provisions ... are

designed to extend strict State regulation to all persons, locations, practices and associations related to the operation of licensed casino establishments" and that "comprehensive law enforcement supervision ... is further designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process." *N.J.S.A.* 5:12–1b(6).

The Act's statutory and regulatory controls cover "virtually every facet of casino gambling and its potential impact upon the public." *Knight, supra,* 86 *N.J.* at 381, 431 *A.*2d 833. To administer the statutory scheme, the Act created a two-tiered regulatory system in which the CCC exercises quasi-legislative and quasi-judicial power, *N.J.S.A.* 5:12–63, and the DGE conducts investigations and prosecutions, *N.J.S.A.* 5:12–76. *State, Dep't Law & Public Safety v. Gonzalez,* 142 *N.J.* 618, 624, 667 *A.*2d 684 (1995).

### B.

In the exercise of its quasi-legislative power, the CCC promulgates regulations controlling the operation of authorized games, odds, and devices. *N.J.S.A.* 5:12–70f. The Act further provides:

All gaming shall be conducted according to rules promulgated by the commission. All wagers and pay-offs of winning wagers shall be made according to rules promulgated by the commission, which shall establish such limitations as may be necessary to assure the vitality of casino operations and fair odds to patrons.

[*N.J.S.A.* 5:12–100e.]

Pursuant to this authority, the CCC has promulgated detailed regulations on blackjack. *N.J.A.C.* 19:47–2.1 to –2.20. For example, the blackjack rules detail the procedure for the shuffle, cut, and deal of cards. *N.J.A.C.* 19:47–2.4 to –2.6.

The Act also authorizes the CCC in the exercise of its quasi-judicial authority to adjudicate regulatory violations. *N.J.S.A.* 5:12–63b; *N.J.S.A.* 5:12–63f; *N.J.S.A.* 5:12–64; *N.J.S.A.* 5:12–129. Thus, the CCC has the responsibility to "receiv[e] complaints from the public relating to the conduct of gaming," and "to conduct all hearings pertaining to civil violations of this act or regulations." *N.J.S.A.* 5:12–63b; *N.J.S.A.* 5:12–63f. In addition, the CCC may

conduct investigative hearings concerning the conduct of gaming and gaming operations, the operation and administration of casino control laws, and any other matter within the CCC's jurisdiction. *N.J.S.A.* 5:12–66.

Proceedings against a licensee must begin with a written complaint that includes "a statement setting forth ... the charges and the acts or omissions supporting such charges." *N.J.S.A.* 5:12–108a. On filing the complaint with the CCC, a copy is served on the casino. Within fifteen days, the casino may notify the CCC of any defenses and request a hearing. *N.J.S.A.* 5:12–108c; *N.J.S.A.* 5:12–108d. Should the CCC find evidence of a violation of the Act or of its regulations, the CCC must refer the matter to the DGE for investigation and prosecution. *N.J.S.A.* 5:12–63g. The DGE or "any person aggrieved by a final decision or order of the commission made after hearing or rehearing by the commission ... may obtain judicial review thereof by an appeal to the Superior Court." *N.J.S.A.* 5:12–110a.

The Act authorizes the CCC to implement various administrative remedies, including the power to grant, deny, or restrict any license or application. *N.J.S.A.* 5:12–64; *N.J.S.A.* 5:12–129. Further, the Act permits the CCC to impose a penalty on any casino licensee "for any cause deemed reasonable." *N.J.S.A.* 5:12–64. Such penalties may include "restitution of any moneys or property unlawfully obtained or retained by a licensee or registrant." *N.J.S.A.* 5:12–129(6).

## C.

The DGE, the law enforcement agency responsible for enforcing the provisions of the Act, assists the CCC with its quasi-judicial role. *N.J.S.A.* 5:12–76; *N.J.S.A.* 5:12–77. After the CCC refers to it evidence of violations of the Act or its regulations, the DGE has the responsibility to "investigate violations of this act and regulations," *N.J.S.A.* 5:12–76b(3), and to "initiate, prosecute and defend" before the CCC all proceedings for violations of the act or any regulations or appeals therefrom. *N.J.S.A.* 5:12–76b(4).

## III.

In *Uston v. Resorts Int'l Hotel, Inc.*, 89 *N.J.* 163, 166, 445 *A.*2d 370 (1982), this Court addressed the right of a casino to exclude patrons solely because they were card counters. Although we recognized that the CCC has the exclusive authority to exclude patrons, we ruled that it had not adopted regulations authorizing any such exclusion. Consequently, we concluded that casinos were not authorized to exclude card counters. *Ibid.* We explained:

> The exhaustive statutes and regulations make clear that the Commission's control over the rules and conduct of licensed casino games is intended to be comprehensive. The ability of casino operators to determine how the games will be played would undermine this control and subvert the important policy of ensuring the "credibility and integrity of the regulatory process and of casino operations."
>
> [*Id.* at 169, 445 *A.*2d 370 (quoting *N.J.S.A.* 5:12–1b).]

We also addressed the effect of the Act on the casino's common-law right of exclusion and the public's corresponding right of reasonable access. *Id.* at 170–74, 445 *A.*2d 370. Noting that casino property was dedicated to use by the public, we held that casinos should not act in an arbitrary and discriminatory manner toward their patrons. *Id.* at 173, 445 *A.*2d 370. In the absence of a regulation authorizing casinos to exclude card counters, Uston's common-law right to reasonable access survived. Although we declined to decide whether the Act empowered the CCC to exclude card counters, we gave the CCC ninety days to adopt regulations permitting countermeasures. *Id.* at 175, 445 *A.*2d 370.

Although the CCC declined to authorize the exclusion of card counters, it adopted specific countermeasures. 14 *N.J.R.* 841(b) (Aug. 2, 1982); 14 *N.J.R.* 991(a) (Sept. 7, 1982). According to the CCC, the countermeasures, as opposed to exclusion, "would result in one player segment having the opportunity to play blackjack who has thus far been excluded from enjoying this game." 14 *N.J.R.* 559(b) (June 7, 1982). Nevertheless, the CCC intended these countermeasures to minimize the perceived threat of card counters to the statistical advantage that casinos need to remain profitable. *See* 14 *N.J.R.* 467–70 (May 17, 1982); 14 *N.J.R.* 559–

69 (June 7, 1982); 14 *N.J.R.* 841(b) (Aug. 2, 1982); 14 *N.J.R.* 991(a) (Sept. 7, 1982).

The countermeasures promulgated by the CCC in 1982 included: (1) the "Bart Carter Shuffle," which is a special shuffling procedure, *N.J.A.C.* 19:47–2.5d; (2) the continuous shuffling shoe, *N.J.A.C.* 18:47–2.20; (3) shuffling-at-will, which allows casinos to shuffle after any round of play, *N.J.A.C.* 19:47–2.5a; and (4) increasing the number of decks from which the cards are dealt, *N.J.A.C.* 19:47–2.2.

In 1978, before our decision in *Uston,* the CCC had adopted a regulation providing that "[a] casino licensee may permit a player to wager on more than one box at a Blackjack table provided however that the Commission and its agents shall have the authority and discretion to prohibit this during hours when there are insufficient seats in a casino to accommodate patron demand." *N.J.A.C.* 19:47–2.14 (subsequently amended); 23 *N.J.R.* 1784(a)(June 3, 1991); 23 *N.J.R.* 2869(b) (Sept. 16, 1991). The CCC did not intend this rule to serve as a countermeasure, but as a means of permitting casinos, through approval of Section 99 internal controls, to prevent card counters from betting on more than one box. *Doug Grant, Inc. v. Greate Bay Casino Corp.,* 3 F.Supp.2d 518, 526 (D.N.J.1998).

During the pendency of this action, the CCC adopted two additional regulations that authorize card-counting countermeasures. One regulation states that a casino, on posting a notice, "may at any time change the permissible minimum or maximum wager at a game table. . . ." *N.J.A.C.* 19:47–8.3(c); *see* 23 *N.J.R.* 1784(b) (June 3, 1991); 23 *N.J.R.* 2613(a) (Sept. 3, 1991); 23 *N.J.R.* 3350(a), 3354(c) (Nov. 4, 1991). A 1993 regulation permits a casino to offer "different maximum wagers" at the same or different gaming tables. *N.J.A.C.* 19:47–8.2(b)–(d); *see* 25 *N.J.R.* 3953(a)(Sept. 7, 1993); 25 *N.J.R.* 5521(a)(Dec. 6, 1993).

At the time of the incidents that provide the basis for this action, TropWorld had adopted Section 99 internal controls. Those internal controls recognized that TropWorld had the discre-

tion to shuffle at will, to permit a player to make more than one wager at a table, and to permit known "high limit players" to exceed the table's betting limit. Plaintiff claims that TropWorld discriminated against him by applying the CCC regulations and its Section 99 internal controls selectively against him, but not against other players seated at the same table.

## IV.

### A.

The Appellate Division held that the CCC has exclusive jurisdiction over plaintiff's common-law discrimination and contract claims. 302 *N.J.Super.* at 118, 694 *A.*2d 1045. Both the CCC and DGE contend, however, that the CCC does not provide a forum for patron complaints seeking money damages. Instead, the two agencies assert that common law claims belong in Superior Court. Our examination of the Act leads us to conclude that the Legislature did not intend to prevent patrons from seeking vindication of common-law claims in the courts. We also hold that the CCC has primary jurisdiction to resolve issues concerning the interpretation of the Act, the CCC regulations, and a casino's Section 99 internal controls.

*N.J.S.A.* 5:12–133b provides in part that the CCC "shall have exclusive jurisdiction over all matters delegated to it or within the scope of its powers under the provisions of this Act." *See also N.J.A.C.* 19:40–1.5b ("The Commission shall have exclusive jurisdiction over all matters delegated to it or within the scope of its powers under the provisions of the Act and these rules."). Hence, the CCC has plenary authority to establish the rules of licensed games. *N.J.S.A.* 5:12–70f. In addition, the Act delegates to the CCC the power to investigate, adjudicate, and punish regulatory violations. *N.J.S.A.* 5:12–63b; *N.J.S.A.* 5:12–63f; *N.J.S.A.* 5:13–64. Nowhere, however, does the Act delegate to the CCC the adjudication of a patron's common-law claims. Although we recognize that the Legislature may vest an administrative agency

with exclusive primary jurisdiction over common-law claims, the Legislature has not granted such jurisdiction to the CCC.

 If the Legislature vests an administrative agency with exclusive primary jurisdiction, that agency may be the only forum in which a party initially may seek relief. *Greate Bay Hotel & Casino v. Tose,* 34 *F.*3d 1227, 1230 (3rd Cir.1994). When, however, the Legislature has not vested such jurisdiction in an agency, a plaintiff may still seek relief in the courts. *Abbott v. Burke,* 100 *N.J.* 269, 297, 495 *A.*2d 376 (1985). Generally, courts decline to grant relief when an adequate administrative remedy exists. If an adequate administrative remedy is available, a party ordinarily must exhaust that remedy before seeking relief in the courts. *Garrow v. Elizabeth Gen. Hosp. & Dispensary,* 79 *N.J.* 549, 558–559, 401 *A.*2d 533 (1979); *Abbott v. Burke,* 195 *N.J.Super.* 59, 477 *A.*2d 1278 (App.Div.1984), *rev'd on other grounds,* 100 *N.J.* 269, 495 *A.*2d 376 (1985); *Patrolman's Benevolent Ass'n of Montclair v. Town of Montclair,* 128 *N.J.Super.* 59, 63, 319 *A.*2d 77 (Ch.Div. 1974).

In *DeFazio v. Haven Sav. & Loan Ass'n,* 22 *N.J.* 511, 514, 126 *A.*2d 639 (1956), for example, a savings and loan denied DeFazio, a depositor, a list of names of other depositors. The relevant statute required depositors to apply to the Commissioner of Banking and Insurance for an order directing the association to provide such a list. The Commissioner denied DeFazio's request. *Id.* at 514–15, 126 *A.*2d 639. Instead of appealing to the Appellate Division, DeFazio instituted an action in the Law Division. This Court held that because the statute provided an adequate administrative remedy for depositors, the Law Division did not have jurisdiction over the claim. *Id.* at 519, 126 *A.*2d 639.

Using a comparable analysis, the Court of Appeals for the Third Circuit nonetheless concluded that the Act did not vest the CCC with exclusive primary jurisdiction over a gambler's claims against a casino for his losses. *Tose, supra,* 34 *F.*3d at 1234–35. In that case, a casino brought an action to enforce a gambling debt against a gambler, Leonard Tose. *Id.* at 1228. Tose counter-

claimed, arguing that the casino intentionally plied him with alcoholic beverages and then encouraged him to gamble while intoxicated. *Id.* at 1228–29. Asserting that the Act vests exclusive jurisdiction in the CCC to order repayment of gambling losses, the casino unsuccessfully moved to dismiss the counterclaim. *Id.* at 1229. After the United States District Court entered judgment in favor of the casino on its complaint, Tose appealed. The casino cross-appealed from the denial of its motion to dismiss the counterclaim. *Id.* at 1229–30.

In affirming the denial of the casino's motion to dismiss the counterclaim, the Third Circuit concluded that the Act's administrative remedies are inadequate. The court reasoned that the Act provides for restitution under *N.J.S.A.* 5:12–129, but not for the award of compensatory or punitive damages. *Id.* at 1233–34. Further, only the DGE, but not an individual patron, may prosecute a claim against a casino before the CCC. *Id.* at 1234–45. Consequently, the Legislature did not intend to give the CCC exclusive primary jurisdiction over Tose's claim. *Id.* at 1235.

■ In the instant case, we likewise hold that plaintiff did not enjoy an adequate administrative remedy to vindicate his damage claim against TropWorld. His only recourse was in the Law Division. We agree with the CCC and the DGE that the Legislature did not intend the CCC to be a court of claims for actions arising under the Act. The Act, for example, does not authorize private litigants to initiate claims for money damages before the CCC. If the Legislature intends that the CCC may award damages in private matters, it should so state explicitly. *Compare N.J.S.A.* 10:5–17 (giving Division of Civil Rights authority to grant damages for violation of Law against Discrimination, including back pay); *N.J.S.A.* 10:5–13 (giving plaintiff option of pursuing Law against Discrimination claim in Superior Court or the Division of Civil Rights). The Act, however, contains no such grant of authority. The CCC is limited to requiring restitution and imposing administrative sanctions, such as civil penalties and license revocation or suspension. *N.J.S.A.* 5:12–129.

A patron may recover on a claim for restitution only if the CCC first finds the claim is meritorious, and the DGE then decides to pursue it. If the CCC summarily rejects a patron's complaint, the patron does not have the right to request a hearing before the CCC. Although the CCC has the authority to conduct investigational hearings concerning the conduct of gaming, *N.J.S.A.* 5:12–66, neither the Act nor the regulations empower patrons to request a hearing if the CCC dismisses their claims. Here, for example, the CCC informed plaintiff, in response to his multiple complaints, that it need not provide him with a private remedy.

By comparison, the Nevada Gaming Act vests the State Gaming Control Board with exclusive jurisdiction over disputes between casinos and patrons over the conduct of games. If the dispute involves at least $500, the casino must immediately notify the Board; otherwise, the casino need only inform the patron of his right to a Board investigation. *Nev.Rev.Stat.* 463.362(1). An agent of the Board must conduct an investigation and determine within thirty days whether payment should be made. A party aggrieved by the agent's decision may request a hearing before the Board. *Nev.Rev.Stat.* 463.363. Until such time as the New Jersey Legislature or the CCC takes similar action, the place for patrons to file private claims for damages is in the Superior Court.

The elaborate legislative and administrative system for regulating casinos suggests, however, that the CCC should exercise primary jurisdiction over issues concerning the interpretation and application of the Act and the regulations. The doctrine of primary jurisdiction, like that requiring exhaustion of administrative remedies, promotes proper relationships between courts and regulatory agencies. *Boss v. Rockland Elec. Co.,* 95 *N.J.* 33, 40, 468 *A.*2d 1055 (1983)(citing *United States v. Western Pac. R.R. Co.,* 352 *U.S.* 59, 63–64, 77 *S.Ct.* 161, 1 *L. Ed.*2d 126 (1956)).

■ Under the doctrine of primary jurisdiction, when enforcement of a claim requires resolution of an issue within the special competence of an administrative agency, a court may defer to a decision of that agency. *Ibid.; Tose, supra,* 34 *F.*3d at 1230 n. 5;

3 Davis & Pierce *Administrative Law* § 14.1 (1994). Although the court may retain jurisdiction over the dispute, it defers action until receipt of the agency's views. *Boss, supra,* 95 *N.J.* at 40, 468 *A.*2d 1055.

The pervasiveness of the regulatory scheme controlling the casino industry indicates that the Legislature intended to invest the CCC with primary jurisdiction to regulate the casino industry. To the extent that the resolution of a plaintiff's claim depends on an interpretation of the Act or administrative regulations, the CCC should have the first opportunity to provide that interpretation. A referral to the CCC should assure the resolution of the controversy consistent with the views of the entity best positioned to consider the matter. Retaining primary jurisdiction in the courts could dislocate the intricate regulatory structure governing a sensitive industry. Permitting courts and juries across the State to interpret statutory and administrative regulations could introduce confusion where uniformity is needed. The lack of uniform interpretations, in turn, could effect the stability of the industry.

B.

The lower courts disagreed on the issue whether the CCC has authorized casinos to apply CCC regulations in a discriminatory manner. As the Law Division saw it, a casino discriminates by allowing non-card counters to play multiple hands while limiting card counters at the same table to one hand. 274 *N.J.Super.* at 76, 643 *A.*2d 42. The Appellate Division, however, had "grave reservations" whether a casino must uniformly apply such a countermeasure against all players at one table. 302 *N.J.Super.* at 110, 694 *A.*2d 1045.

Within its delegated authority, the CCC may adopt regulations that require the uniform application of countermeasures to all players at a blackjack table or that permit the selective application of such countermeasures against card counters only. Regulations in effect in 1989 failed to state expressly whether

casinos could selectively apply countermeasures against players at one table. The CCC suggests that casinos could so apply countermeasures, but at oral argument it was uncertain whether a casino could lower the limit for card counters and simultaneously allow other players to bet at the former limit or higher. Absent a regulation, a patron may not be on notice of the rules of the game.

## V.

We next turn to the question whether the Superior Court may entertain a casino patron's private damage claim. The Act does not address whether a casino patron may maintain a civil action for damages based on violations of statutory or administrative provisions. *Miller v. Zoby,* 250 *N.J.Super.* 568, 573, 595 *A.*2d 1104 (App.Div.), *certif. denied,* 127 *N.J.* 553, 606 *A.*2d 366 (1991). It expressly grants jurisdiction to the Superior Court only for the award of injunctive relief and treble damages arising from such nefarious activities as racketeering, loansharking, and securities manipulation. *N.J.S.A.* 5:12–126; *N.J.S.A.* 5:12–127; *Miller, supra,* 250 *N.J.Super.* at 573–75, 595 *A.*2d 1104. The absence of any express provision for a cause of action for discriminatory application of CCC regulations, however, does not necessarily mean that the Legislature intended that no such actions should exist. Indeed, the presumption is against statutory abrogation of a common-law right. To abrogate a common-law right, the Legislature must speak plainly and clearly. *DeFazio, supra,* 22 *N.J.* at 519, 126 *A.*2d 639; *State v. Cruz Constr. Co., Inc.,* 279 *N.J.Super.* 241, 245, 652 *A.*2d 741 (App.Div.1995). Should a casino engage in invidious discrimination, we have no doubt that the Superior Court could entertain an appropriate action.

In the absence of a common-law basis, courts have been reluctant to imply a private right of action for money damages in favor of casino patrons. *See, e.g., Marcangelo v. Boardwalk Regency Corp.,* 847 *F.Supp.* 1222, 1228 (D.N.J.1994)(holding no implied private cause of action under Act for casino patron for inadequate or defective slot machine signage when casino complied

with applicable statutory and regulatory requirements), *aff'd,* 47 *F.*3d 88 (3rd Cir.1995); *Decker v. Bally's Grand Hotel Casino,* 280 *N.J.Super.* 217, 222, 655 *A.*2d 73 (App.Div.1994)(holding CCC has exclusive jurisdiction over claims that casino violated regulations regarding gaming equipment signage); *Miller, supra,* 250 *N.J.Super.* at 576–77, 595 *A.*2d 1104 (holding no implied private action for money damages for violation of Act's credit provisions). Given the elaborate regulatory scheme, we likewise decline to imply a cause of action when no such cause of action exists at common law. *Miller, supra,* 250 *N.J.Super.* at 578, 595 *A.*2d 1104.

 Plaintiff's claim of discriminatory treatment, however, has a common-law basis. Even without statutory or regulatory support, a casino has a common-law duty to treat patrons fairly. *Uston, supra,* 89 *N.J.* at 173, 445 *A.*2d 370. Remaining is the issue whether the CCC permits casinos to discriminate among patrons by lowering the betting limit for a card counter while retaining or raising it for other patrons. The impact of such discrete treatment is less drastic than that of the exclusion of card counters in *Uston.* Although the CCC has not adopted an express regulation, by other regulations, the CCC may have implicitly permitted casinos to apply a separate set of rules to card counters seated at the same table as other patrons. An issue of this kind is especially suited for consideration by the CCC in the exercise of its primary jurisdiction. Accordingly, the Law Division should remand the matter to the CCC so that agency may interpret its own regulations.

## VI.

The Appellate Division perceived several errors in the jury instructions on plaintiff's claim of malicious prosecution. Consequently, it reversed the entry of the judgment awarding plaintiff damages of $1,000,213.50 on that claim. We agree substantially with the Appellate Division's analysis.

The problem with the charge on malicious prosecution stems from the charge on discrimination. As the Appellate Division explained,

> In its instructions regarding the discrimination claim, the trial court informed the jury that if TropWorld had required plaintiff to play under rules different from the rules applied to other players at the same table, then TropWorld had illegally discriminated against plaintiff. As indicated, defendants did not deny that they had applied countermeasures only to plaintiff. Thus, the instruction in effect told the jury that defendants had been guilty of invidious discrimination. We are persuaded that the jury's consideration of the discrimination claim in the context of this instruction had the capacity to prejudice TropWorld with regard to the malicious prosecution claim.
>
> [302 *N.J.Super.* at 119, 694 *A.*2d 1045.]

The malicious prosecution charge suffered from defects of its own. Although the charge generally followed the outline of Model Jury Charge § 3.12, it failed to relate the charge to the facts, many of which were in dispute. Relating the law to the facts as the jury finds them can be essential for a proper verdict. *McCann v. Biss*, 65 *N.J.* 301, 303–04 n. 1, 322 *A.*2d 161 (1974). To assist jurors in making factual findings, courts sometimes must comment on the evidence. *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 176, 406 *A.*2d 140 (1979); *Village of Ridgewood v. Sreel Inv. Corp.*, 28 *N.J.* 121, 128, 145 *A.*2d 306 (1958).

Here, after charging the elements of malicious prosecution and defiant trespass, the court instructed the jury on the affirmative defenses to defiant trespass as set forth in *N.J.S.A.* 2C:18–3c.

> Those affirmative defenses include *N.J.S.A.* 2C:18–3c(2) which provides that it is a defense if the structure "was … open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining in the structure." The instruction, however, did not relate this defense to the facts of the case. There was no explanation of what constituted "lawful conditions imposed on access to or remaining in the structure." Thus, there was no explanation of the fact that casino management may, under certain circumstances, lawfully require a person to leave the premises though a casino is otherwise "open to members of the public." Indeed, the entire instruction regarding the malicious prosecution claim was delivered in the abstract and failed to relate those legal principles to the evidence in the case and the factual contentions of the parties.
>
> [302 *N.J.Super.* at 119–20, 694 *A.*2d 1045.]

The critical issue at trial was whether defendants had probable cause to initiate the municipal court proceeding. The charge,

however, failed to relate the elements of probable cause to the facts as the jury found them. Generally, to prove they were the victims of malicious prosecution, plaintiffs must prove four elements: the defendant instituted a criminal action against the plaintiff; the defendant was motivated by malice; probable cause did not support the filing of the complaint; and the complaint terminated favorably to the plaintiff. *Lind v. Schmid*, 67 *N.J.* 255, 262, 337 *A.*2d 365 (1975). Although the parties agree that defendants instituted a criminal action that terminated favorably to plaintiff, they disagree whether defendants acted with malice and without probable cause.

On that point, the testimony of the parties differed. According to Scully, when he first arrived at the blackjack table, plaintiff had "physical control of the cards." A video tape confirmed this statement, as well as other portions of Scully's testimony. Scully testified that he told plaintiff two or three times that if he did not give up the cards he would be arrested. After plaintiff relinquished the cards, he was told to leave the game. Plaintiff refused and said that he would have to be "physically taken off the game." Scully interpreted that statement as a threat to TropWorld's security personnel. Confronted with a patron who was using abusive language and threatening the security personnel, Scully concluded that plaintiff had committed defiant trespass and disorderly conduct. At that point, as Scully explained, Duffield told plaintiff that he was ejected and that he would be arrested if he did not leave. If believed, Scully's testimony would support a finding that TropWorld was justified in concluding that plaintiff had committed the offenses.

Plaintiff, in contrast, denied shouting, cursing or acting in an aggressive or threatening manner. He admitted being told to leave the blackjack table and warned that if he did not leave, he would be arrested. Although plaintiff acknowledged that he refused to leave, he stated that before his arrest, "I was never asked to leave or ejected," "I was never asked to leave the premises."

■ Probable cause is a familiar, but elusive concept. Critical to a finding of probable cause is the determination of the underlying facts. In a malicious prosecution action, when the underlying facts are in dispute, the jury bears the responsibility of making that determination. *Paul v. National Educ. Ass'n,* 195 *N.J.Super.* 426, 429, 480 *A.*2d 213 (App.Div.1984). For the jury to discharge its responsibility, the trial court must provide proper instructions. *Vladar v. Klopman,* 89 *N.J.L.* 575, 578, 99 *A.* 330 (E. & A.1916). Given the inconsistencies in the testimony, the trial court should have summarized the parties' versions to frame the inquiry whether a person of ordinary prudence would believe on reasonable grounds in the truth of the charges. The absence of such a summary provides a further reason for vacating the malicious prosecution judgment.

As the Appellate Division observed, notwithstanding the existence of some factual difference, this may be an appropriate case for the grant of defendants' motion for summary judgment on the claim of malicious prosecution. 302 *N.J.Super.* at 122–23, 694 *A.*2d 1045. Summary judgment may be appropriate when the evidence " 'is so one-sided that one party must prevail as a matter of law.' " *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 536, 666 *A.*2d 146 (1995) (citation omitted). Consistent with the Appellate Division's observation, our remand is without prejudice to defendants' right to renew their motion for summary judgment in the Law Division.

Finally, we note that plaintiff died during the pendency of the appeal in the Appellate Division, but that no personal representative has been substituted for him. Although no application has been made in this Court, Anthony J. Campione, Jr., executor of plaintiff's estate, moved in the Appellate Division to be substituted as the plaintiff with a corresponding change in the caption of the matter. By order, the Appellate Division denied the motion "without prejudice to its being renewed in the trial court after appeal is decided, if necessary." On remand, the executor should comply with the practice for the substitution of a deceased plain-

tiff. *See R.* 4:34–1(a) (pertaining to substitution of a deceased party).

## VII.

As modified, the judgment of the Appellate Division is affirmed.

*For modification and remandment*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.