751 A.2d 111 (2000)
331 N.J. Super. 40
ATLANTIC CITY SHOWBOAT, INC., Petitioner-Appellant,
v.
The DEPARTMENT OF COMMUNITY AFFAIRS OF the STATE of New Jersey, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 2000.
Decided May 15, 2000.
*112 Gerard W. Quinn, Atlantic City, for petitioner-appellant (Cooper Perskie April Niedelman Wagenheim & Levenson, attorneys; Mr. Quinn, on the brief).
Allan J. Nodes, Deputy Attorney General, for respondent-respondent (John J. Farmer, Jr., Attorney General of New Jersey, attorney; Mark J. Fleming, Assistant Attorney General, of counsel; Mr. Nodes, on the brief).
Before Judges KING, CARCHMAN and LINTNER.
The opinion of the court was delivered by KING, P.J.A.D.

I
This appeal presents a situation where the gaming and public safety concerns of casino design and construction may conflict. Appellant Atlantic City Showboat, Inc. (Showboat) contends that the regulatory authority of the Casino Control Commission (CCC) should prevail over the authority of the Department of Community Affairs (DCA) with respect to certain recently adopted DCA design and construction safety regulations for casinos, N.J.A.C. 5:23-9.6.
This is a sensitive area. We are uncertain if there is an actual present conflict between the two regulatory schemes. We decline to strike the challenged regulations on conflict or preemption grounds on this record. If, or when, a true conflict emerges, we are confident that the DCA and the CCC will coordinate regulation in the overall public interest. If not, this court can then resolve any conflict, probably and preferably after a record is created at an evidentiary hearing. Meanwhile, we remand to both agencies so that Showboat may seek declaratory relief under the Administrative Procedure Act (APA), N.J.S.A. 52:14B-8, at a joint hearing under the auspices of the Office of Administrative Law (OAL), see Mortgage Bankers Ass'n of N.J. v. New Jersey Real Estate Comm'n, 102 N.J. 176, 506 A.2d 733 (1986).

*113 II
On May 18, 1998 the DCA published 30 N.J.R. 1678 which proposed amendments to N.J.A.C. 5:23-9.6. The DCA solicited comments to the proposed amendments and received them from several sources, including appellant Showboat. On August 14, 1998 the Commissioner of the DCA adopted the proposed amendments. They were filed on August 18, 1998 and published on September 21, 1998 at 30 N.J.R. 3466.
Pursuant to R. 2:2-3(a)(2), Showboat filed a notice of appeal on November 4, 1998, facially challenging the validity of the adopted amendments. Showboat contends:
POINT I THE DCA ACTED IN VIOLATION OF THE CASINO CONTROL ACT WHEN IT CREATED THESE REGULATIONS AND PURPORTED TO ASSUME CONTROL OVER THE NATURE, SIZE, AND DENSITY OF SLOT MACHINES IN THE CASINOS OF ATLANTIC CITY.
POINT II THE AMENDMENT TO THE DCA REGULATIONS CREATING NEW AND ONEROUS RESTRICTIONS UPON THE CONSTRUCTION AND LAYOUT OF THE CASINO FLOOR AND THE DENSITY AND SIZE OF SLOT MACHINES SHOULD BE INVALIDATED AS THERE IS AN ABSENCE OF ANY FACTUAL BASIS ON THE RECORD FOR THESE STRICTURES.

III
Before the promulgation of the amendments under challenge, the DCA specifically had regulated certain limited aspects of casino gaming operations in Atlantic City. Prior to the challenged amendment, the DCA regulation N.J.A.C. 5:23-9.6 provided:
Interpretation: Fixed central pedestal seating in casinos
(a) Fixed central pedestal seating (stools) shall be allowed within major aisles and cross-aisles in casinos for gaming patrons who use standard size slot machines or other similar machines, within these aisles, provided the following requirements are met:
1. Schematic drawings shall be submitted to [DCA] for review and approval which indicate the dimensions and locations of the stools, and the distances from adjacent fixtures, walls or other fixed objects;
2. Stool placement shall not result in any reduction of the required aisle accessway width when measured from the stool and any other adjacent obstacle, including, without limitation, other stools in back-to-back seating arrangements;
3. Stools that swivel and have a back rest shall be restricted so as to rotate in only one direction, operate in a series, and be self-centering; and
4. A minimum clearance of eight inches, measured from the face of the gaming machine base at knee height, shall be provided between the gaming machine and the stool and a minimum clearance of 10 inches, measured from seat edge to seat edge, shall be provided between adjacent stools, in order to ensure discharges clearances.
This earlier regulation was limited to fixed pedestal seating at casinos. In 1998, the DCA issued the more comprehensive regulations, challenged here, seeking to more strictly regulate the floorplans of casinos.
The new regulations added an additional requirement to stool placement: "[t]he minimum clear width of aisles with slot stools shall be 48 inches." N.J.A.C. 5:23-9.6(a)(5). The regulation also added new requirements as to the layout of the casino floors.
(b) The following code requirements shall apply to all gaming floors:
*114 1. The use group of the gaming floor shall be A-2.[1]
2. Each gaming floor area shall be designed using an open landscape plan such that there is clear visibility throughout the floor and at least two of the exits are clearly discernible from all portions of the floor. Line of sight obstructions shall be limited and shall be subject to the approval of the Department.
3. An egress study shall be provided for each new egress route and for all modifications to an existing egress route, increases in occupant load or changes of egress elements for gaming floor areas.
i. The occupant load shall be calculated at 7.5 square feet per person gross for all gaming floor areas, regardless of the gaming activity.
ii. The total capacity of the means of egress shall be calculated based on 116 2/3 percent of the calculated occupant load of any floor area containing gaming activities and any adjacent spaces using the gaming floor for exit access.
iii. Travel distances shall be delineated on the egress study and shall be measured from each and every occupiable point on the gaming floor to the closest exit. The travel distance shall be measured along the natural path of travel using a distance of one foot from obstructions, corners and walls and using the center of door openings.
iv. Each egress route shall identify the travel distance, number of occupants and size and type of egress elements.
[N.J.A.C. 5:23-9.6(b)(1) to (3).]
The amendments also regulated "back-of-house" areas which require security by applying the "special locking arrangements in penal facilities" section of the BOCA Code to those areas. N.J.A.C. 5:23-9.6(b)(4).
Most controversial, the amendments also included specific restrictions on the height, placement and size of slot machines:
5. Each slot machine installed on gaming floors shall comply with the following:
i. Each slot machine, other than those located at perimeter walls and columns, shall have a maximum overall height of 65 inches including base, except if the slot machine is placed at a location on the casino floor that would not cause a lack of compliance with (b)5ii below;
ii. A slot machine shall not obstruct visibility throughout the gaming floor, the visibility of exit signage or the operation of fire protection systems; and
iii. The base of the slot machine shall be constructed of noncombustible or fire-retardant treated material.
[N.J.A.C. 5:23-9.6(b)(5).]
The DCA also issued new regulations restricting types, placement and use of signs in a casino. These amendments stated that all signage must be "labeled, approved and identified by an approved testing laboratory." N.J.A.C. 5:23-9.6(b)(6)(i). Each sign must be "attached to a wall, post or ceiling," and post-signs above slot machines must be fastened to the slot machine base. N.J.A.C. 5:23-9.6(b)(6)(ii). If a sign has a moving section, it must "be equipped with a failsafe provision" so that the sign does not release, fall or shift its center of gravity more than 15 inches. N.J.A.C. 5:23-9.6(b)(6)(iii). No sign may "obstruct visibility throughout the gaming floor, the visibility of exit signage or the operation of fire protection systems." N.J.A.C. 5:23-9.6(b)(6)(iv). The final two amendments required that certain equipment (monitor cabinets, change banks, fillers and similar items) be constructed of noncombustible or fire-retardant treated *115 materials, and that certain fire-safety precautions be taken when any part of the casino is under construction. N.J.A.C. 5:23-9.6(b)(7); N.J.A.C. 5:23-9.6(c).
The original proposal for these amendments published in 30 N.J.R. 1678 (May 18, 1998) solicited comments. The proposal claimed that adoption of the regulations would have no social impact, no adverse economic impact, and no job impact. The proposal also claimed there would be no adverse effect in these areas because the regulations "being proposed for codification reflect current industry practice."
The DCA received numerous comments from casinos, gaming equipment manufacturers and distributors, architects, citizen groups, transportation services and the Atlantic City Chamber of Commerce. Many commentators felt that the allegedly burdensome new regulations would undermine Atlantic City's competitive position because casinos or slot-machine vendors in neighboring states impose no such restrictions. Showboat agreed with many of these critical comments, asserting that the 65-inch requirement on slot machines and the blanket requirement that the casino "not obstruct visibility throughout the gaming floor, the visibility of exit signage or the operation of fire protection system" was a serious competitive threat, not imposed on casinos in other states. Many of the comments from other sources agreed with Showboat. The Chamber of Commerce also objected to the 65-inch slot-height requirement, observing that the regulation and supporting documentation gave no justification for the height limit. IGT, a slot machine manufacturer, observed that the 65-inch rule "has been in place for years," but argued that the market for slots has changed, and that players prefer taller games with video screens and additional equipment at the top of the slot machine. IGT "conservatively estimated" that the regulation would cost casinos $27,375,000 in revenue per year; this would mean the State would lose over $2,000,000 in tax income per year. The DCA responded that its primary concern was the safety of the casino patrons. Simply because other states had different regulations, the DCA would not compromise patron safety.
Showboat also commented that the DCA did not have authority to regulate slot machines or the layout of the casino floors because the Casino Control Act granted exclusive jurisdiction over these areas to the CCC. The DCA responded that this regulatory concern fell within its purview because location of fixtures and egress routes are controlled by the Uniform Construction Code, which the DCA is charged with enforcing.
There was debate among commentators whether the aisle width requirement was too large or too small. The DCA replied that the aisles were already required to be wheelchair accessible, and that since a wheelchair is 29 inches by 42 inches, a space smaller than 48 inches would leave insufficient room for passage of wheelchairs through aisles.
Commentators also stated that the "open landscape" requirement did not comport with the realities of Atlantic City, was vague and impractical, and eventually would cause the elimination of slot machines from Atlantic City. The DCA answered that this requirement had existed for years and applied not only to casinos but to all buildings in New Jersey. The DCA's goal was to make egress as easy as possible in an emergency situation.
Many commentators felt that the BOCA A-2 "use group" classification, which normally refers to dance halls and nightclubs, was inappropriate and overly restrictive. The DCA countered that, while casinos are not the same as dance halls or nightclubs, both uses have much in common, particularly when an emergency requires a mass evacuation.
There was also considerable concern by commentators, that the blanket application of the 7.5 square-feet-per-person occupancy load should be increased, or at least *116 differentiated between different parts of the casino. This concern dwelt on two issues. First, collections of patrons around slot machines is usually denser than collections around black-jack or baccarat tables, and thus a uniform, casino-wide density restriction was inappropriate. Second, one commenter felt the 7.5 standard was based on the twenty-year-old situation in 1978 when Atlantic City had only one casino, Resorts, and crowds were much larger at that casino. The DCA's response was that the 7.5-square feet requirement had already been in place. The DCA admitted that BOCA codes mandated varying requirements. BOCA codes require fifteen-square-feet per person for areas where patrons occupy chairs at tables, seven-square-feet per person in areas where patrons occupy fixed seating and three-square-feet per person in areas where patrons stand. Confronted with these varying areas present in casinos, the DCA took an average measurement to determine the density requirement, and uniformly applied that density requirement to all areas throughout the casino.
In the Attorney General's brief, the DCA explains its methodology:
A number of respondents also commented upon the occupancy load of 7.5 square feet per person. Some commentators thought that the limit should be increased while others felt that it should be decreased. DCA pointed out that this occupancy load was the one that had been in effect in Atlantic City prior to the amendments. Moreover, the Department stated that the occupancy load was based on the maximum number of persons who can safely exit the room in an emergency and, of necessity, must be on a worst case scenario. DCA further noted that BOCA section 1008.1 establishes three occupancy levels which may be applied to different areas within a casino: 15 square feet per person for areas where all occupants occupy chairs at tables, seven square feet per person where all occupants occupy fixed seating and, three square feet per person where all occupants stand. Since the percentage of people standing and sitting varies from day to day, DCA performed an occupancy load analysis of several casinos and arrived at the 7.5 square feet per person occupancy load.
Despite this adverse substantive reaction, the DCA adopted the amendments and issued the regulation, N.J.A.C. 5:23-9.6, effective September 21, 1998. The record before us contains no formal position by the CCC on these challenged regulations.

IV
In 1977 the Legislature adopted the Casino Control Act, N.J.S.A. 5:12-1 to -210, to legalize casino gambling and create the CCC since
[i]t is in the public interest that the institution of licensed casino establishments in New Jersey be strictly regulated and controlled pursuant to the [ ] findings [of this Act] and pursuant to the provisions of this act, which provisions are designed to engender and maintain public confidence and trust in the regulation of the licensed enterprise....
[N.J.S.A. 5:12-1(b)(13).]
The Legislature created the CCC, among other things, to "promulgate such regulations as in its judgment may be necessary to fulfill the policies of this act." N.J.S.A. 5:12-63(c). Additionally, the CCC can exercise any powers not expressly provided for in the statutes as long as such "proper power or authority [is] necessary to perform the duties assigned to it by law." N.J.S.A. 5:12-75.
The Commissioner of the DCA has "all powers necessary or convenient to effectuate the purposes of" the State Uniform Construction Code Act. N.J.S.A. 52:27D-124. The purpose of the Uniform Construction Code Act, N.J.S.A. 52:27D-119 to -141, is "[t]o insure adequate maintenance of buildings and structures throughout the State and to adequately protect the health, safety and welfare of the people." N.J.S.A. 52:27D-120(e).
*117 The Casino Control Act and the State Construction Code each contain preemption sections which apply when their powers conflict with another agency's powers or regulations. The Casino Control Act provides that:
If any provision of this act is inconsistent with, in conflict with, or contrary to any other provision of law, such provision of this act shall prevail over such other provision and such other provision shall be deemed to be amended, superseded or repealed to the extent of such inconsistency or conflict. * * * The [CCC] shall have exclusive jurisdiction over all matters delegated to it or within the scope of its powers under the provisions of this act.
[N.J.S.A. 5:12-133(b).]
The State Construction Code states:
Any law or regulation to the contrary notwithstanding, the structure, design, construction, maintenance and use of all buildings or structures to be erected and the alteration, renovation, rehabilitation, repair, maintenance, removal, or demolition of all buildings or structures already erected shall be regulated pursuant to the "State Uniform Construction Code Act."
[N.J.S.A. 52:27D-123.1.]
Each preemption section attempts to have its regulatory scheme supersede or prevail over any other law or regulation with which it conflicts.

V
Showboat claims, in this "turf war" which it posits, that the CCC should prevail as the exclusive gaming-regulation entity. The DCA claims the exclusive right to regulate casino safety concerns. As noted, we have no official position from the CCC on this dispute.
The CCC is concerned with gaming, and safety as well; the DCA is concerned exclusively with safety. In truth, at least on this record, there is no actual "turf war" between the CCC and the DCA. The CCC is not a party here, and so far as we know, has voiced no formal objection to the new regulation. The DCA has not denied any applications by Showboat for casino changes or new construction under the new regulations. Nor has the DCA denied any applications by Showboat for variations or exceptions to the new regulations, see N.J.A.C. 5:23-2.9 to -2.13, or prosecuted Showboat for any existing violations under the new regulations. The "non-party" CCC presents no official stance on the new regulations. Thus, we are confronted with an abstract facial challenge, entirely without specific context. The only record is the comments and responses after publication and before promulgation of the amended regulation.
N.J.A.C. 5:23-9.6(5) promulgated by DCA clearly regulates slot machines as to size, location and density, i.e., aisles at least 48 inches, height no more than 65 inches, and occupancy load; slot machines may be higher than 65 inches if "located at perimeter walls and columns," N.J.A.C. 5:23-9.6(b)(5)(i), or located so as to "not obstruct visibility throughout the gaming floor" of exit signs or the operation of fire protection systems. N.J.A.C. 5:23-9.6(b)(5)(ii).
In comparison, the Casino Control Act seemingly gives the CCC exclusive control over slot machines:
The [CCC] shall, by regulation, determine the permissible number and density of slot machines in a licensed casino so as to:
(a) promote optimum security for casino operations;
(b) avoid deception or frequent distraction to players at gaming;
(c) promote the comfort of patrons;
(d) create and maintain a gracious playing environment in the casino; and
(e) encourage and preserve competition in casino operations by assuring that a variety of gaming opportunities is offered to the public.

*118 Any such regulation promulgated by the [CCC] which determines the permissible number and density of slot machines in a licensed casino shall provide that all casino floor space and all space within a casino licensee's casino simulcasting facility shall be included in any calculation of the permissible number and density of slot machines in a licensed casino.
[N.J.S.A. 5:12-100(h)(2).]
Thus, any regulation of density, size and location of slot machines, by the DCA at least nominally conflicts with the CCC's delegated power to regulate the slot-machine landscape in a casino and to make the patrons secure, comfortable and safe. Each casino must submit a detailed proposed floor plan, including the location and density of slot machines, to the CCC and must obtain the CCC's approval before implementing the floor-plan design. N.J.A.C. 19:43-7.3. The CCC also has promulgated N.J.A.C. 19:46-1.27, which very specifically regulates the location and density of slot machines on a casino gaming floor but does not limit height or aisle width (Appendix A). In reality, under the DCA's new regulation, a casino must obtain approval of its floor plan for slot machines from both the CCC and the DCA. One may well imagine a proposed floor plan could be approved by the CCC and rejected by the DCA. To date, this apparently has not occurred. If this occurs, there would be a concrete controversy. Thus, we perceive no true conflict before us at present, only an abstract concern.
The Casino Control Act became effective June 2, 1977. N.J.S.A. 5:12-1. The DCA's powers under the State Construction Code became effective on February 4, 1976. This is of interest for several reasons. "Implied repealers are strongly disfavored and will be judicially recognized only when there is clear and compelling legislative intent evinced by the subsequent enactment." State v. Resorts Int'l Hotel, Inc., 173 N.J.Super. 290, 296, 414 A.2d 269 (App.Div.), certif. denied, 84 N.J. 466, 420 A.2d 1294 (1980). In Resorts, we refused to recognize a claim of implied repealer and declined to find that the Casino Control Act superseded the child labor laws as applied to children working in casinos. Id. at 298, 414 A.2d 269.
However, when construing conflicting statutes, a court must assume that the legislature, when enacting a law, was familiar with all existing statutory law as well as common law. Yanow v. Seven Oaks Park, 11 N.J. 341, 350, 94 A.2d 482 (1953). Recognizing that the Legislature was aware of the State Construction Act, it made the "statutory and administrative controls over casino operations established by the [Casino Control] Act [ ] extraordinarily pervasive and intensive." Uston v. Resorts Int'l. Hotel, Inc., 89 N.J. 163, 168, 445 A.2d 370 (1982) (quoting Knight v. Margate, 86 N.J. 374, 380-81, 431 A.2d 833 (1981)). In refusing to allow the Casino Control Act by implication to supersede the Child Labor Laws, we explicitly recognized that there was only one passing reference to minors in the casino statute. Resorts, 173 N.J.Super. at 297, 414 A.2d 269. Thus, that ruling of no intent to preempt and its implied-repealer analysis does not necessarily guide us here. Other courts in other contexts have examined the pervasiveness of the Casino Control Act and found that it indeed does preempt well-settled areas of law. E.g., Hakimoglu v. Trump Taj Mahal Associates, 70 F.3d 291, 293 (3rd Cir.1995)(finding that dram shop laws do not apply to casinos).
Our Supreme Court has said that the CCC may issue a regulation which selectively applies personally discriminatory countermeasures to "card counters" at a blackjack table. Campione v. Adamar of N.J., Inc., 155 N.J. 245, 264-65, 714 A.2d 299 (1998). The federal District Court has held that signage in a casino, particularly related to slot machines, rests specifically within the purview of the CCC, pursuant to N.J.S.A. 5:12-100(h) and -133(b). Marcangelo v. Boardwalk Regency Corp., 847 F.Supp. 1222, 1229 (D.N.J.1994). The *119 DCA's argument that it may regulate all buildings in New Jersey fails to survive close scrutiny. Our Supreme Court has held that the DCA may not use its power under the State Construction Code to unilaterally regulate buildings owned by the Delaware River Port Authority, a bi-state agency. Eastern Paralyzed Veterans Ass'n, Inc. v. City of Camden, 111 N.J. 389, 398, 545 A.2d 127 (1988).
Here, while the DCA has a particular interest in insuring that casino buildings are safe, the CCC has a similar safety interest, but more particularly, it must protect the public perception and profitability of casinos. This responsibility is reflected, for instance, in the Legislature's finding that, "it is in the public interest that the regulatory and investigatory powers and duties conferred by [the Casino Control Act] include the power and duty to review architectural and site plans." N.J.S.A. 5:12-1(11). Resting the authority to regulate floor plan layouts and slot machine size, location and density with the CCC is consistent with the idea that "[t]he pervasiveness of the regulatory scheme controlling the casino industry indicates that the Legislature intended to invest the CCC with primary jurisdiction to regulate the casino industry." Campione, 155 N.J. at 264, 714 A.2d 299.
The DCA does not question that casinos are unique buildings in the State of New Jersey. We cannot readily expect all general building code standards to apply without exception to specialized casino uses. And, the CCC is in a unique position of having the expertise in casino gambling operations, coupled with the charge to review architectural layouts and to regulate slot machines, including size, location and density. N.J.S.A. 5:12-1 and -100(h).
We conclude that this case does not suffer from the implied repealer concerns generally troubling to our courts. The Casino Control Act clearly gives the CCC power to review floor plans and architecture. N.J.S.A. 5:12-1(11). It also grants the CCC exclusive control over slot machines and signage in casinos. N.J.S.A. 5:12-100(h)(2); Marcangelo, 847 F.Supp. at 1229. Thus, this challenged regulation and the generous powers granted to and used by the CCC do seem at least facially "inconsistent" and "repugnant," to the DCA regulation. Resorts, 173 N.J.Super. at 296, 414 A.2d 269. But we are not satisfied to simply rule that one agency here holds all the regulatory cards to the exclusion of the other. This is especially true where there is no actual dispute for us to measure and adjudicate.

VI
In this perplexing situation, and without a developed record, we resort to the solution adopted by the Supreme Court in Mortgage Bankers Ass'n of N.J. v. New Jersey Real Estate Comm'n, 102 N.J. 176, 506 A.2d 733 (1986). The Administrative Procedure Act permits an agency upon request of an interested person to issue a declaratory ruling with respect to the applicability of any person, property or state of facts of any statute or rule enforced or administered by that agency. N.J.S.A. 52:14B-8; see In re CAFRA Permit No. 87-0959-5, Issued to Gateway Associates, 152 N.J. 287, 300, 704 A.2d 1261 (1997); Steven L. Lefelt, Administrative Law and Practice, 37 New Jersey Practice § 83 at 92 (1988 and Supp.). In Mortgage Bankers Ass'n of N.J. v. New Jersey Real Estate Comm'n, 200 N.J.Super. 584, 491 A.2d 1317 (App.Div.1985), real estate brokers were attempting to determine the legality of an arrangement where they would refer real estate buyers to mortgage companies with which the brokers were affiliated. We reversed a declaratory ruling by the Real Estate Commission which concluded that N.J.S.A. 45:15-17(i) did not bar a real estate broker from obtaining compensation for services rendered in the sale and, in addition, compensation for assisting buyers in obtaining mortgage financing. We concluded that the Real Estate Commission erred in allowing dual compensation in this context *120 and, in any event, should have proceeded by rule-making rather than declaratory adjudication. Id. at 608, 491 A.2d 1317. The Supreme Court reversed us and remanded to both the Real Estate Commission and the Department of Banking for joint OAL hearings pursuant to the APA to develop an adequate record for deciding an issue of substantial public interest.
In Mortgage Bankers, 102 N.J. at 179, 506 A.2d 733, the Supreme Court found the record before the Real Estate Commission was "insufficient to reflect either the diverse and complex economic factors pertinent to the issue or the overlapping regulatory interests of the Commission and the Department of Banking." Id. at 179, 506 A.2d 733. The Court reversed and remanded to both the Real Estate Commission and the Department of Banking to conduct joint hearings "in order to produce a record sufficiently comprehensive to afford a proper basis for both agency action and judicial review." Id. at 179, 506 A.2d 733.
The Supreme Court stated the reason for its mandate in this perceived conflict between agencies:
Accordingly, in order to recognize the independent regulatory interest of the Commissioner of Banking, we remand this matter to both the Commissioner of Banking and the Real Estate Commission to hold joint hearings, which shall be conducted by an administrative law judge assigned by the Director of the Office of Administrative Law. N.J.S.A. 52:14B-10(c); N.J.S.A. 52:14F-5(n), (o). See City of Hackensack v. Winner, 81[82] N.J. 1, 36-37 [410 A.2d 1146] (1980). To the extent that the hearings are adjudicative and involve the interpretation of N.J.S.A. 45:15-17(i), the Real Estate Commission shall be deemed to have the predominant interest. N.J.A.C. 1:1-14.5 [now N.J.A.C. 1:1-17.5]. To the extent that the hearings involve rulemaking, N.J.S.A. 52:14B-4, the administrative law judge shall make recommendations to each agency regarding the adoption of appropriate regulations. N.J.S.A. 52:14B-4(g). We have previously recognized the need for administrative agencies to use hybrid proceedings, characterized by both the adjudicative and rulemaking functions, in the discharge of their statutory responsibilities.
[Id. at 192, 506 A.2d 733.]
he case returned to us in Mortgage Bankers Ass'n of N.J. v. New Jersey Real Estate Comm'n, 283 N.J.Super. 233, 661 A.2d 832 (App.Div.1995). Judge Brody's opinion for this court reported the outcome of the remand to both agencies:
Aware that the way the statute is interpreted would have a major effect on the way real estate is bought and sold, the Court remanded the matter to the Commission and to the Commissioner of the Department of Banking, who had not been called upon previously to exercise his regulatory authority over the marketing and sale of real estate mortgages. The Court directed that the agencies conduct joint hearings, that the Commission reconsider its interpretation of the statute in light of the evidence adduced at those hearings, and that both agencies consider adopting appropriate regulations on the subject. Mortgage Bankers, supra, 102 N.J. at 192, 506 A.2d 733.
The Commission and the Commissioner carried out the Court's mandate by first referring the matter to the Office of Administrative Law. An Administrative Law Judge (ALJ) was directed to conduct evidentiary hearings and make findings describing the avenues available to a buyer interested in obtaining a residential mortgage loan. The ALJ was also directed to suggest to the Commission a proper interpretation of the statute in light of those findings. Finally, the ALJ was charged with the task of recommending to both the Commission and to the Commissioner the substance of new regulations that each agency might adopt to enforce the statute in a *121 way that would complement the Commission's interpretation.
[Id. at 238-39, 661 A.2d 832.]
After the extensive OAL hearing the ALJ "issued an initial decision and report that is comprehensive, detailed, clear and sensitive to the viewpoints of all parties." Id. at 239, 443 A.2d 773. "The [Real Estate] Commission adopted the ALJ's initial decision and both agencies drew heavily on his report when they enacted new regulations." Ibid. This court rejected a challenge to the regulations cooperatively adopted by both agencies, with one minor modification, stating: "we sustain the regulations, deferring to the agencies' expertise in channeling the cross-currents of the real estate and mortgage loan markets." Id. at 241, 661 A.2d 832. We believe that intra-agency cooperation in this case before us will produce an equally harmonious result.

VII
We are most reluctant to issue a definitive ruling on the challenged regulation, N.J.A.C. 5:23-9.6, in the absence of an adequate record and participation by the CCC. We have no way of actually knowing, generally or particularly, whose views should prevail in this abstract dispute those of the DCA, the CCC or the dually-regulated casino industry. Indeed, we are not even certain there is a real, as opposed to an abstract, conflict in this situation. Showboat has not been denied anything and does not appear imminently threatened by prosecution for violations of these 1998 regulations relating to the height and location of slots, floor plans, safety signs, and so forth. This dual regulatory scheme yields no legally clear-cut resolution for us, either by statute or regulation.
Thus, we follow the Mortgage Bankers model, set out by the Supreme Court in 1986 and envisioned earlier by Justice Handler in City of Hackensack v. Winner, 82 N.J. 1, 37-38, 410 A.2d 1146 (1980), upon the inception of the OAL in 1978, when he said:
There is thus every reason to expect that the real or imagined qualitative gaps in the decisional process between different administrative agencies will in the immediate future become narrower and that cross-agency controversies will become more amenable to handling in a single agency proceeding by judges with a breadth of expertise, range of experience, and adjudicatory deftness sufficient to deal with all of the ramifications of the matter and to accommodate the genuine interests of any and all governmental bodies whose jurisdictional nerves are touched.
[Ibid.]
See also Lemelledo v. Beneficial Management Corp. of America, 150 N.J. 255, 273-75, 696 A.2d 546 (1997); for an analysis of the jurisprudence of conflict and controversy between agencies, see Howard H. Kestin, "Justice Alan B. Handler: The Jurist as Scholar, Teacher, Craftsman, and Statesman," 30 Seton Hall L.Rev. 715, 719-22 (2000).
We remand to the DCA and the CCC to entertain petitions for declaratory relief by appellant Showboat pursuant to the APA, N.J.S.A. 52:14B-8. Showboat should file a petition with each agency which will then refer the matter to the OAL. The administrative law judge will consolidate the petitions pursuant to N.J.A.C. 1:1-17.1 and issue any appropriate order concerning predominate interest under N.J.A.C. 1:1-17.5 to -17.8. This proceeding should resolve the conflict claimed by Showboat to have resulted from the dual regulatory scheme and from the alleged, though to us somewhat doubtful, tension between public safety and the economic well-being of the gaming industry. At the least, this will afford an opportunity for resolution between the agencies of this claimed regulatory conflict, real or chimerical, on a sensible basis and an avenue for meaningful appellate review, if needed, on a properly developed record.
*122 Remanded to the DCA and the CCC for further proceedings; we do not retain jurisdiction.

APPENDIX A
N.J.A.C. 19:46-1.27 states:
Slot machine areas; density; arrangement; floor plans
(a) Slot machines used in the conduct of gaming shall be located and arranged in such a manner so as to:
1. Promote optimum security for the casino operation;
2. Avoid deception or frequent distraction to players at gaming tables;
3. Maximize the comfort of patrons;
4. Create and maintain a gracious playing environment in the casino; and
5. Encourage and preserve competition to casino operations by assuring that a variety of gaming opportunities is offered to the public.
(b) Each casino licensee shall be permitted to install and operate one slot machine for every 10 square feet of its casino floor space which may be allowed to slot area, as determined in accordance with (d) below.
(c) Each casino licensee shall arrange the layout of its casino floor so that whenever one row of slot machines in a casino is lined up back with another row of slot machines in a casino is lined up back to back with another row of machines, the two rows shall be separated by metal grating or other type of barrier, as approved by the Commission, that will prohibit a person from placing his or her hand between the rows of machines.
(d) The total amount of casino floor space that a casino licensee may utilize for slot machines, the walkways between them, and other structures or areas which are reasonably related to the use of slot machines ("Slot Area") such as slot booths, change booths, change machines, slot carousels, walls, columns or other architectural structures, and any other structures or areas which are reasonably related to, and contained within casino floor space which is dedicated to, the use of slot machines, shall not exceed 90 percent of the total amount of casino floor space and casino simulcasting facility floor space.
(e) The total amount of casino floor space dedicated to the Slot Area shall be measured by identifying the perimeter of each such area on the casino floor plan.
(f) Any casino floor space which is not used for slot area pursuant to (e) above shall be dedicated to authorized games other than slot machines and related support and circulation space.
(g) Each casino licensee or applicant shall submit to the Commission a detailed floor plan, drawn to scale, depicting its proposed arrangement of slot machines, slot stools and table games. Such plan shall indicate all relevant floor space square footage; density information; and aisle dimensions, including the dimensions of aisles between rows of slot machines facing each other, of distances in front of slot machines not directly facing another slot machine, and of distances between slot stools and other obstructions or slot machines. Each casino licensee shall maintain on file with the Commission a current floor plan certified as to its accuracy.
(h) Each casino licensee or applicant seeking approval for a proposed arrangement of slot machines shall submit to the Commission a detailed floor plan, drawn to scale, depicting its proposed arrangement of slot machines, slot stools and table games and shaded to include all areas covered by (e) above. Such plans or attachments thereto shall indicate the amount of casino floor space by slot zone, or other subdivision of the total area included in the calculation required by (e) above, as approved by the Commission, and the total of such areas. Each casino licensee shall maintain on *123 file with the Commission a current shaded floor plan certified as to its accuracy.
(i) Any floor plan submission that satisfies the requirements of this section shall be deemed approved by the Commission unless the casino licensee is notified in writing to the contrary within three days of filing.
(j) Slot machines shall not be permissible in casino simulcasting facilities.
NOTES
[1] Use Group A-2 comes from the Building Officials and Code Administrators International, Inc., or the BOCA Code and applies to "all buildings and places of public assembly, without theatrical stage accessories, designed for occupancy as dance halls, nightclubs and for similar purposes." BOCA National Building Code § 303.3.